Filed 4/6/21  In re L.A. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re L.A., a Person Coming Under the Juvenile Court Law. | C089919 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, | (Super. Ct. No. JD239766) |
| Plaintiff and Respondent, | |
| v. | |
| R.A., | |
| Defendant and Appellant. | |

R.A., father of the minor (father), appeals from the juvenile court's order asserting dependency jurisdiction and removing the minor from his custody.  (Welf. & Inst. Code, §§ 300, 361, 395.)[1]  We will affirm the juvenile court's orders.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

1

FACTUAL AND PROCEDURAL BACKGROUND

The minor, L.A., came to the attention of the Sacramento County Department of Child, Family and Adult Services (Department) on March 21, 2019, when it was reported that the minor and his sibling, K.A.,[2] (collectively referred to as the children) were being held at separate facilities on involuntary psychiatric holds pursuant to section 5150. Law enforcement was contacted after the minor, who was in a psychotic state, threatened to run into traffic and shoot himself. The minor had previously been admitted to the Aurora Hospital on February 20, 2019, due to "unspecified psychosis" and was discharged March 15, 2019, just days prior to the current incident, at which time father was informed his prognosis was "poor." Dr. Conner, the minor's treating physician during the previous incident, reported he suspected the minor would discontinue his medication, and stated that while the minor was stable upon discharge, the minor was experiencing psychosis, refusing to attend groups, and exhibiting thought disintegrations, internal preoccupation, and limited insight and did not want to continue his medication. Dr. Conner noted the minor had not been socially interacting for quite some time, did not leave the home very often, and appeared to have been ignored for some time.

Father reportedly left for Africa on March 18, 2019, and left the children in the care of M.A., their 21-year-old sibling. M.A. informed law enforcement officers that he did not know if or when father would return to Sacramento. M.A. also stated he would be leaving for Alaska in one week and could no longer care for the children.

The children's mother, who suffered from schizophrenia, had been conserved and placed in a mental health treatment center since October 2018 following the suicide of her eldest son and the children's sibling A.A. who provided mother's care until his untimely death. A.A.'s suicide was not discovered until mother's neighbors called law

---

[2]     Father appealed from the juvenile court's orders as to minor L.A. only. We mention minor K.A. only when relevant to the issues raised by father.

2

enforcement regarding a strange smell coming from mother's house. It was discovered that A.A. had been deceased in the home for approximately one week.

On March 22, 2019, medical staff from the mental health crisis center where the minor was placed reported the minor had been at the crisis center for nearly 23 hours, the maximum time allotted, and attempts to contact father had been unsuccessful. As a result, the crisis center was unable to obtain father's authorization to provide necessary hospitalization and treatment for the minor. Medical staff had been in contact with M.A., who stated he felt overwhelmed caring for his younger siblings and informed staff that he could no longer provide care for the minor and K.A. The social worker spoke with the minor, who was gravely disabled and could not complete a formal interview other than to state that the food at the crisis center "tasted like 'piss' " and demand to be taken to Taco Bell.

That same day, the social worker spoke with father in Nigeria via telephone. Father stated he was looking for the first flight home to Sacramento and had made arrangements with both crisis facilities to provide care to the minor and K.A. When asked whether he had reason to suspect the minor and K.A. could be suffering from mental health issues, father stated he was surprised by the current circumstances as there was no indication that either child was suffering from any mental health issue. He stated that M.A. would be able to care for the children in the event of discharge from their respective facilities. When the social worker informed father that M.A. was unable to care for the children's mental health issues, father was adamant that M.A. was an adult and was therefore able to provide adequate care and supervision for the children in his absence, noting M.A. did not have the financial means to move to Alaska and did not have a valid California driver's license.

On March 29, 2019, the social worker spoke with M.A. who stated that, having spoken with father, he wanted to clarify that he was willing and able to care for the minor and K.A. until his father's return from Nigeria. M.A. explained that he would purchase

3

food and clothing for the children but, when asked how he would address issues of follow-up care such as treatment, appointments, and therapy, he responded, "I don't know. They would have to figure it out themselves." When asked how he would address issues regarding changes or adjustments in medication directed by mental health professionals, M.A. responded, "I don't know. I'm not their legal guardian."

That day, the social worker was informed by the director of social services at the facility where K.A. was being held, that K.A. continued to be gravely ill and suicidal and father had not authorized medications stating, "[T]here is nothing wrong with her," and that she was just upset due to the minor's circumstances. The director stated she was unable to make contact with father and would contact CPS to make a new report.

When the social worker spoke with father later that day, father stated he did not authorize medication for K.A. because he had not spoken to a doctor. Father revealed he had been summoned to court in Nigeria but would not reveal the nature of his case. He became flustered and frustrated when asked about his plans to return to Sacramento stating he did not know, he needed approximately two weeks to prepare a written response to the summons, and he had not purchased a round trip ticket with a return date. Father became agitated and asked why CPS was involved. The social worker explained that CPS was involved due to the difficulty the mental health care professionals were having contacting father in order to obtain his authorization for treatment for his children. Father asserted there was nothing wrong with K.A., and claimed the minor had been receiving the help he needed and was not going anywhere. The social worker informed father that it was necessary for him to return to Sacramento and work closely with the mental health care providers to provide adequate care and supervision for his ill children and ensure timely provision of services. Father said he would be talking with the doctor over the weekend regarding medication for K.A. and reiterated that M.A. was able to care for the children because he was an adult.

4

On April 2, 2019, father informed the social worker that he planned to return to Sacramento on May 15, 2019, but would continue to search for an earlier return flight. In the meantime, the social workers and service providers met to discuss ultimate discharge plans for the minor and K.A. and determine whether father could meet the children's needs if he was still out of the country. The inability to speak with father on a routine basis was problematic for all involved and the treatment team expressed grave concerns for the children's aftercare upon discharge from their respective care facilities. The minor, who by that time had been in a 23-hour crisis care facility for 12 days, remained gravely disabled.

Due to information from father that the minor was not previously compliant with his antipsychotic medications, the treatment team began treating the minor with a long-term injectable antipsychotic medication. Staff reported that while the minor remained psychotic and delusional, his behavior was neither assaultive nor problematic, he was easily redirected, and he was improving in his daily functioning. The minor was scheduled to receive another injectable dose of medication on April 4, 2019, and pending continued improvement, would be ready for discharge the following week. In the meantime, he had been approved for wraparound services through the Sacramento Children's Home. Staff noted its continuing concern that placements, medication changes, and new providers would all require authorization from father.

On April 3, 2019, the social worker met with the minor who was responding well to treatment and medication and was engaging and personable. The minor stated he wanted to go home and was prepared to walk home if necessary. He also stated he enjoyed interacting with his peers.

*Dependency Petitions*

On April 3, 2019, the Department filed dependency petitions on behalf of the minor and K.A. pursuant to section 300, subdivisions (b) and (g) alleging father failed to provide adequate care, supervision, and protection for the children by failing to make

5

adequate arrangements for the care of the minor and K.A.—the minor having a history of mental illness and prior mental health hospitalizations—before father left for Nigeria on March 18, 2019. It was further alleged that both the minor and K.A. were placed on involuntary psychiatric holds and both required intensive mental health treatment, medications, and placements. Father's unavailability resulted in delayed treatment and lapses in services to both children. It was also alleged that father was not scheduled to return from Nigeria until May 15, 2019, and left the minor and K.A. in the care of M.A., who was unable or unwilling to provide ongoing care for the children. Because mother was in a mental health treatment facility due to her own psychiatric issues, there was no responsible adult willing and able to care for the minor and K.A.

The court ordered the minor and K.A. detained. On April 15, 2019, over the objection of father's counsel, the court granted the minor's request for voluntary inpatient psychiatric treatment and the Department's prejurisdiction request to continue psychotropic medication and for wraparound services.

*Addendum Report*

According to an April 2019 addendum report, the minor was taken to a mental health crisis treatment center on April 24, 2019, due to decompensation after hallucinating throughout the day. In its dispositional recommendations, the Department detailed the basis for its position that placement of the minor with father was not appropriate. For example, father took the minor and K.A. to the home of their deceased sibling, A.A., immediately following the removal of A.A.'s body by the coroner. The children recalled seeing A.A.'s blood on the floor, flies throughout the house, and smelling the odor of " 'a dead corpse.' " Father reportedly had a lengthy history of failing to meet the children's physical, emotional, and mental needs dating back to October 2003, including 13 separate CPS investigations. He failed to accept that the minor and K.A. had psychiatric needs well beyond his ability to treat without the assistance of medical health care professionals. He was currently unwilling to participate

6

in an interview with the social worker. The Department recommended the children remain in out-of-home care and father engage in reunification services.

*Jurisdiction/Disposition Report*

The jurisdiction/disposition report stated the social worker spoke by telephone with father on April 9, 2019, to request verbal consent for the minor to receive wraparound services and psychotropic medication and to obtain the minor's medical records from his prior hospitalization. Father became hostile, yelled at the social worker, questioned why it was necessary to review the minor's medical records, and declined consent, claiming he would return to Sacramento " '[s]oon' " and would take care of the minor himself, and refusing to provide information on his return flight or the purpose of his trip to Nigeria. When the social worker attempted to schedule an investigative interview via telephone, father said, " 'I'm not doing anything with you! I'm going to Court with you!' "

During an interview on April 12, 2019, the minor reported having spoken with father the prior day, at which time father advised him to not cooperate with the Department, decline placement in a foster home, and not take his prescribed medication. The minor reported his mental state had improved and he wanted to return home or, alternatively, to live with his neighbor whose name he did not know. He stated he could walk from his home to the treatment center to receive his medication. However, he claimed he and everyone at the crisis center had cancer due to radiation in the treatment center, which had decreased since he opened his bedroom window. He also claimed he was a superhero named "Magneto," but his powers did not always work.

The report stated the minor was observed at the crisis treatment center from March 21, 2019 to April 16, 2019, and that following a period of observation and evaluation, he no longer met the section 5150 criteria and he denied suicidal ideation or homicidal thoughts and was not exhibiting self-harming behaviors or psychotic symptoms. It was recommended that he continue his prescribed medication regimen and

7

return to the center on May 2, 2019, for another injection. Upon his discharge, the minor was placed at the Sacramento Children's Home where he continued to receive mental health services.

When the social worker met with the minor at the Sacramento Children's Home on April 19, 2019, the minor stated the psychotropic medication was " 'pissing [him] off' " and his vision was blurry. After learning the minor had sporadic telephone contact with father, who instructed him to stop taking his psychotropic medication, the Department instructed that the minor's telephone calls be monitored.

*Amended Dependency Petitions*

On April 29, 2019, the court granted the Department leave to file amended dependency petitions adding a section 300, subdivision (c) allegation that the minor and K.A. suffered, or were at substantial risk of suffering, serious emotional damage evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others because father left the country on March 18, 2019, and declined to approve administration of services to aid in the stabilization of the children's mental health.

*Jurisdiction Hearing*

On April 30, 2019, the court granted the parties' request to amend the dependency petition by adding a subdivision (g) allegation and dismissing the subdivisions (b) and (c) allegations as to K.A., and then sustained the amended allegation as to K.A. and, at the request of father's counsel, set the matter for a contested jurisdiction hearing as to the minor.

The court also set the matter for hearing on the Department's application for psychotropic medication for the minor. The request was supported by a physician's statement indicating that, based on an in-person evaluation of the minor on April 29, 2019, the minor remained "gravely disabled by psychosis" and was experiencing

8

delusions and "exhibiting catatonia," all of which was treatable by antipsychotic treatment.

On May 6, 2019, the court ordered a mental health assessment of father.

*Addendum Report*

The June 2019 addendum report chronicled the social worker's in-person interview with father on April 29, 2019. Father reported that when the minor was previously held at Aurora Hospital, he was informed the minor could be held for two weeks pursuant to section 5150 or father could voluntarily place the minor in Aurora Hospital where the minor could remain hospitalized as long as needed to stabilize. Father stated he opted for the latter option and met with staff prior to the minor's discharge, at which time he was informed the minor was given medication via injection and was fully stable upon discharge.

Father reported the minor returned home and resumed his schoolwork and appeared well. Then, when father left for Nigeria, he received telephone calls from M.A. stating the minor was acting up and throwing things around the house. Father instructed M.A. to call law enforcement to take the minor back to the hospital. However, when law enforcement arrived, they would not take the minor to the hospital as he did not meet the criteria for a section 5150 hold. Father stated he pleaded by telephone with the officers but was told only K.A. met the section 5150 criteria.

Father claimed the following day M.A. informed him that the minor had " 'trashed the house.' " Father directed M.A. to call law enforcement and the minor was transported to the hospital. Father stated he had telephone contact with the hospital and requested that the minor be given an injectable medication. Father claimed he spoke regularly with nurses regarding the minor's care and made himself readily available to all professionals working with the minor. In particular, he claimed the emergency response social worker called him approximately 20 times, all of which he answered.

9

Regarding the death of the minor's older sibling, A.A., father believed law enforcement killed A.A. and, while the scene in the home after A.A.'s death was emotionally difficult for him to view, he took the minor and K.A. to see it because the children were old enough to make their own decisions and he wanted them to make up their own minds about the circumstances surrounding A.A.'s death. Father denied having any mental health issues.

The Department continued to recommend out-of-home placement for the minor while father participated in reunification services, noting that father continued to demonstrate his needs took priority over the well-being of the minor. It was also noted that, throughout the interview, father failed to acknowledge how his decisions and parenting practices had been detrimental to the minor's physical and emotional well-being.

*Contested Jurisdiction/Disposition and Psychotropic Medication Review Hearing*

At the contested jurisdiction and psychotropic medication review hearing on July 1, 2019, social worker and court investigator Julie Wuest testified that the first time she spoke with father was by telephone on April 9, 2019. At that time, father was upset, uncooperative, and unwilling to speak with her about the minor's care.

Wuest testified the minor was currently stable and doing well at the Sacramento Children's Home. It continued to be her recommendation that the minor not be returned to father's care because she was concerned father would not be able to care for the minor's medical needs due, in part, to his refusal to cooperate with her (including his refusal to authorize a release of medical information from the hospital following the minor's first section 5150 hold), as well as the emotional abuse father inflicted on the minor and K.A. when he brought them to the home where A.A. committed suicide. In that regard, Wuest testified it was inappropriate for father to expose the minor to the scene because the minor had a close relationship with A.A. and was still a child.

10

Wuest stood by her recommendation that the court sustain the section 300, subdivision (b) allegation as to the minor because father failed to make appropriate arrangements for the care and supervision of the minor prior to leaving for Nigeria on March 18, 2019. Wuest stated father left the minor and K.A. under the care of M.A., who was not able to adequately meet the children's mental health needs, had to defer to father for any questions, and had no transportation to ensure the minor could receive follow-up care following his discharge from the hospital following his first section 5150 hold. While M.A. changed his mind after expressly stating he was not able to meet the children's needs, he could not state how he could or would appropriately do so.

Wuest testified the minor's discharge prognosis was poor after the first hospitalization due to concerns that the minor would be noncompliant with medication. Indeed, once discharged, the minor stopped taking his medication. Additionally, upon discharge from the hospital, staff referred the minor for mental health services. However, he was not seeing a therapist or a mental health provider when he was taken into protective custody a second time. Following discharge from the crisis center to the Sacramento Children's Home, the minor had a subsequent section 5150 hold due to psychosis.

Wuest stated the basis for the subdivision (c) allegation was, in part, that father was not in California and was therefore not available to receive the minor upon discharge or meet the minor's needs thereafter. She testified that once the minor was admitted to a crisis treatment center, he had to be assessed within 24 hours and a treatment plan put in place. The treating physician was unable to obtain father's authorization to administer medication to the minor because father could not be contacted. Once the Department was able to make contact, father vacillated between believing the minor needed help and not believing the minor had any psychiatric issues. On occasion, father told the Department he did not believe the minor suffered from any mental illness or that he needed any

11

mental health treatment.  Wuest testified father declined to authorize wraparound services necessary to discharge the minor into placement.

Wuest testified father's CPS history demonstrated numerous referrals in which father failed to meet the minor's needs and his failure to meet the needs of the minor's siblings despite staff's attempts to contact him to get appropriate services in place.

The court sustained the subdivision (c) allegation, finding father's lack of understanding of the seriousness of the minor's mental illness and his extensive CPS history supported a finding that there continued to be a substantial risk that the minor would suffer emotional damage even after father returned from Nigeria because father was incapable of providing adequate mental health care.  The court dismissed the remaining subdivisions (b) and (g) allegations, noting father had returned to California and "is prepared to care for [the minor]."  Finding there was a substantial danger to the minor's emotional well-being if returned to father, the minor was suffering severe emotional damage, and there were no reasonable means by which the minor's emotional health could otherwise be protected, the court ordered that the minor remain in out-of-home placement and that father participate in reunification services and have regular visitation consistent with the minor's well-being.  The court left the Department with discretion as to whether the visits would be supervised.

DISCUSSION

I

Father contends the juvenile court's jurisdictional order was not supported by substantial evidence.  He claims the evidence showed, and the court found, he had returned to California from Nigeria and was prepared to care for the minor.  The claim lacks merit.

Section 300, subdivision (c) provides that a child comes within the jurisdiction of the juvenile court where "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety,

12

depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care."

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 170.) " 'If there is any substantial evidence to support the [jurisdictional] findings of the juvenile court, a reviewing court must uphold the trial court's findings. All reasonable inferences must be in support of the findings and the record must be viewed in the light most favorable to the juvenile court's order. [Citation.]' " (*Id.* at p. 168.) "[I]ssues of fact and credibility are the province of the trial court. [Citation.]" (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) If supported by substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary judgment and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

To establish the minor came within the juvenile court's jurisdiction under section 300, subdivision (c), the Department had to establish "the following three elements: (1) serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior or a substantial risk of severe emotional harm if jurisdiction is not assumed; (2) offending parental conduct; and (3) causation." (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379.)

The amended petition alleged, pursuant to section 300, subdivision (c), the minor was suffering serious emotional damage or was at risk of suffering serious emotional damage as a result of father's inability to provide appropriate care in that the minor was discharged from a psychiatric facility on March 15, 2019, with extensive discharge

13

recommendations, father left the country on March 18, 2019, three days later the minor was again placed on a section 5150 hold after he exhibited psychotic behaviors, and father declined to approve administration of services to aid in stabilization of the minor's mental health.

Relying repeatedly on the court's statement that father had returned to California and was "prepared to care for [the minor]," father claims the section 300, subdivision (c) jurisdictional findings were premised on past conduct and there was no evidence of current risk to the minor. We disagree.

As a preliminary matter, the court noted father was back in the country and was prepared to care for the minor as the basis for dismissing the subdivisions (b) and (g) allegations and after having found father was not capable of providing appropriate care for the minor under subdivision (c). Further, contrary to father's repeated claims, and as demonstrated by the whole of the court's findings, the court's statement that father was "prepared to care for" the minor was not dispositive of the issue of whether father was able and willing to appropriately do so. As we discuss hereafter, there was substantial evidence to support the finding he was not.

As the court found, father left the minor and K.A. (who was also suffering from acute mental health issues) in the care of their 21-year-old brother, M.A., just three days after the minor's release from his first section 5150 hold. M.A. confessed he felt overwhelmed caring for the children, and he intended to move to Alaska even though he did not know when father would be returning to California. While he later recanted that statement after speaking with father, telling the social worker he was willing and able to care for the children until father's return, the court did not find M.A.'s statement credible.

Even assuming M.A. was willing to care for the minor and K.A., the record makes plain that he was not able to do so. M.A. explained he would care for the children by purchasing food and clothing for them. However, he did not know how he would address issues of follow-up treatment, appointments, and therapy, or changes and adjustments in

14

medications as directed by mental health professionals, stating the minor and K.A. "would have to figure it out themselves" and he was "not their legal guardian." Nevertheless, father remained adamant that M.A. was an adult and was therefore able to provide adequate care and supervision for the children in his absence.

Even when father was providing M.A. direction as to how to respond to the minor's issues, there was a delay in getting the minor the care he needed while in the crisis treatment center. Staff reported that the inability to speak with father on a routine basis was problematic, and the treatment team expressed grave concerns for the minor's aftercare upon discharge from the crisis treatment center. Father argues his "object[ion] to the Department's involvement altogether" did not create a substantial risk of harm if returned to father's custody and care. We disagree. As of April 2019, father was unwilling to participate in an interview with the social worker, he refused to consent to release of the minor's medical records from his prior hospitalization, and he refused to give consent for wraparound services and psychotropic medication for the minor. He directly interfered with the minor's treatment by instructing the minor not to take his prescribed medication or cooperate with the Department and to decline placement in a foster home. As a result, the Department was forced to submit a prejurisdiction motion for authorization to continue psychotropic medication and minor's counsel was forced to request voluntary inpatient psychiatric treatment, both of which father opposed. Father's intense acrimony toward the Department created a continuing, substantial risk of serious emotional damage to the minor's mental health and well-being if returned to father's care and custody.

The record also makes plain that, during the time father was in Nigeria and after his return to California, father lacked an understanding of the seriousness of the minor's mental illness. For example, father told the social worker there was no indication the minor was suffering from any mental health issue and continued to argue the minor was receiving the help he needed and wasn't going anywhere. He thought the minor was fine

15

upon discharge after the first section 5150 hold, despite the fact that the treating physician informed father the minor's prognosis was poor and there was a concern the minor would stop taking his medication. Similarly, father was under the impression the minor had been given an injectable medication at the time of his discharge following his first section 5150 hold, yet the treating physician informed father the type of medications prescribed to the minor and his concern that the minor would not be medication compliant. During his testimony at the jurisdictional hearing, father had difficulty identifying who was monitoring the minor or what medications the minor was taking, claiming he did not "have control of [the minor]." He was also unaware that the minor had threatened to take an officer's gun and shoot himself with it. He did not inquire about the discharge plan for the minor in May 2019 when the minor was returned to the Sacramento Children's Home following another section 5150 hold. He claimed he was not given any information about the minor's treatment at the Sacramento Children's Home but admitted he never requested to see the minor's mental health treatment records.

Noting father's CPS history, the court also found father had a "long-standing history of failing to provide adequate mental health care for his children." Father argues, without citation to authority, that a parent's pattern of failing to meet his child's needs is not a basis for removal. To the extent this observation, made in passing and without citation to authority, is intended to constitute an argument, it must be deemed forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B) [each point in appellate brief must be supported by citation of authority]; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [lack of authority or analysis constitutes forfeiture].)

Father also argues his CPS referral history does not constitute substantial evidence of a current risk of harm to the minor. Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection. (*In re Petra B.* (1989) 216 Cal.App.3d

16

1163, 1169.) Here, father's extensive CPS history[3] began in 2003 and continued through 2019 and included approximately 18 referrals to CPS, most of which demonstrated a pattern of father's failure to appropriately address the minor's mental health issues (as well as those of his siblings) and, like the current circumstance, his habit of leaving the minor and his sibling either in the care of someone who could not provide adequate supervision or without any supervision at all. That history, coupled with father's consistent efforts to thwart the minor's treatment and his lack of understanding of the seriousness of the minor's mental health issues, provided sufficient evidence that father was incapable of providing adequate mental health care to the minor, who continued to be at substantial risk of suffering emotional damage despite father's return from Nigeria.

We conclude there was sufficient evidence to support the court's exercise of jurisdiction over the minor.

II

Next, father contends there was insufficient evidence to support the court's order removing the minor from his custody. He argues there was no evidence of a current substantial danger of harm to the minor if returned to his custody. He further argues the court failed to consider less drastic alternatives to removal and failed to articulate its specific reasons for removing the minor. The claim lacks merit.

To support an order removing a child from parental custody, the court must find clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); see *In re Heather A., supra*, 52 Cal.App.4th at

---

[3]     We do not consider, as part of our analysis, any CPS referral determined to be unfounded.

p. 193.) The court also must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) Removal findings are reviewed under the substantial evidence test, drawing all reasonable inferences to support the findings and noting that issues of credibility are matters for the trial court. (*In re Heather A.,* at p. 193.)

Having exercised jurisdiction over the minor, the court stated, "As to disposition, *for the reasons stated before*, I find by clear and convincing evidence that there is a substantial danger to [the minor's] emotional well-being if he were returned to the father and that [the minor] is suffering severe emotional damage and no reasonable means by which his emotional health can be protected without removal." The court also adopted the findings and orders recommended in the April 25, 2019 addendum report.

As previously discussed in part I of this opinion, substantial evidence supports the juvenile court's jurisdictional finding that there was a substantial danger to the minor's emotional well-being if returned to father. The minor continued to suffer, and was at substantial risk of suffering, severe emotional damage due to father's conduct, both while out of the country and after returning to California, demonstrating he was incapable of providing adequate mental health care to the minor. " 'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. [Citation.]' [Citation.]" (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

There was also ample evidence presented at the jurisdiction/disposition hearing to support the juvenile court's finding that there were no reasonable means by which to protect the minor's emotional health without removing the minor from father's custody. Mother suffered from schizophrenia and had been conserved and placed in a mental health treatment center since October 2018. The minor's sibling, K.A., had her own mental health issues. The minor's adult sibling M.A. was unable to provide appropriate

18

care for the minor. Given that father was incapable of providing adequate care for the minor, there was no one else available or appropriate to provide care for the minor.

Father argues the court could have returned the minor to his custody under strict supervision by the Department, on the condition that father not leave the country, with family maintenance services specifically tailored to the minor and father. We are not persuaded.

The juvenile court may consider, as an option to removal, returning a minor to parental custody under stringent conditions of supervision. (See, e.g., *In re Jeannette S.* (1979) 94 Cal.App.3d 52, 60.) It is difficult under these circumstances to discern how supervision by the Department or any other alternative to removal would have been successful in assisting father to maintain a safe home where the minor's mental health needs were being met. We need not reiterate our previous discussion regarding father's inability to meet the minor's needs. Suffice it to say that father's continued failure and refusal to cooperate with the Department, caregivers, and service providers (both while in Nigeria and after he returned to California), his outright interference with the minor's treatment, his lack of appreciation for the severity of the minor's mental health needs, and his pattern of failing to meet the needs of the minor and his siblings in the past provided significant evidence that placing the minor with father under strict supervision was not a reasonable alternative to removal. The fact that the father was back in the country does not change that conclusion.

Given the documentary and testimonial evidence considered by the juvenile court at the jurisdiction/disposition hearing, there was sufficient evidence to support the court's removal order.

### III

Finally, father contends the court abused its discretion when it gave the Department discretion to decide whether father's visits with the minor would be

19

supervised. He claims there was no substantial evidence that unsupervised visits would jeopardize the safety of the minor. We disagree.

The court has broad discretion in fashioning visitation orders, and its determination will not be disturbed on review absent a clear abuse of discretion. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) Here, as discussed at length above, father's continued failure and refusal to cooperate with the Department, caregivers, and service providers, his interference with the minor's treatment (including his direct communication with the minor that encouraged noncompliance with doctors' orders), his lack of appreciation for the severity of the minor's mental health issues and needs, and his pattern of failing to meet the needs of the minor and his siblings in the past provided significant evidence that it was reasonable to give the Department discretion to determine whether visits between father and the minor should be supervised.

Based on this record, we conclude the juvenile court's visitation order was permissible.

DISPOSITION

The juvenile court's orders are affirmed.

/s/
_____
BLEASE, J.

We concur:


/s/
_____
RAYE, P. J.



/s/
_____
DUARTE, J.

20